```
                                    UNITED STATES DISTRICT COURT
                                    SOUTHERN DISTRICT OF FLORIDA

                                    CASE NO. 10-80201-Civ-HURLEY
                                            (07-80077-Cr-HURLEY)
                                    MAGISTRATE JUDGE P. A. WHITE
BRANDON BEASLEY,                :

     Movant,                    :       REPORT OF
                                        MAGISTRATE JUDGE
v.                              :

UNITED STATES OF AMERICA,       :

     Respondent.                :
_____
```

## I. Introduction

This matter is before the Court on the movant's motion to vacate pursuant to Title 28, Section 2255, attacking his sentence for conspiracy to commit bank robbery, armed bank robbery, and use of a firearm during and in relation to a crime of violence, following a guilty plea in criminal case number 07-80077.

The Court has reviewed the motion to vacate, supporting memorandum and reply, the Government's response and appendix of exhibits, the Presentence Investigation Report ("PSI"), and all pertinent portions of the underlying criminal file.

## II. Claims

Construing the *pro se* movant's arguments liberally, Haines v. Kerner, 404 U.S. 519 (1972), he appears to raise the following claims in his Section 2255 motion:

   1.   Counsel was ineffective for failing to investigate the voluntariness of Beasley's confession and moving to suppress the same;

1

    2.    The sentence violates due process because it relies on uncharged offenses to which Beasley did not plead guilty and for which he was not tried.

(Cv-DE# 1).

He claims an evidentiary hearing is required to resolve his claim of ineffective assistance of counsel.

### III. Procedural History

The relevant procedural history of the underlying criminal case is as follows. Beasley was charged with the following in regards to the robbery of a Washington Mutual bank in Fort Worth: Count (1), conspiracy to commit bank robbery (18 U.S.C. §§ 2113(a), (d) and 371), Count (2), armed bank robbery (18 U.S.C. §§ 2113(a), (d) and 2), and Count (3), use of a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)(i)-(ii)). (Crim-DE# 6).

Beasley pled guilty to all counts without a written plea agreement. (Crim-DE# 41). The Court explained at the plea hearing that Beasley's guidelines score would be determined after the plea was entered based on a variety of factors including Beasley's background and prior convictions. (Crim-DE# 62 at 23-24). The Court explained the highest sentence Beasley faced with all counts running consecutively was life plus thirty years, plus a $750,000 fine and five years of supervised release. (Crim-DE# 62 at 28-29). In addition, the Court explained the Government would be able to make recommendations at the sentencing hearing. (Crim-DE# 62 at 30-31). Beasley agreed he understood the charges against him, the rights he was waiving, and stated he had not been promised anything and was not coerced. (Crim-DE# 62).

The Government proffered a factual basis for the plea including the following:

> The defendant made a post-arrest statement admitting his and his brother's involvement in the bank robbery April 7, 2007. The defendant provided details of that bank robbery and, in his statement, the defendant identified himself as the person in the lobby who held the assault rifle and said that his brother was the person with the semiautomatic pistol who went to the vault.

(Crim-DE# 62 at 38).

Beasley admitted that he said and did the things the Government had suggested and entered a guilty plea. (Crim-DE# 62 at 39, 41).

The PSI calculated a base offense level of twenty plus an increase of two levels for taking the property of a financial institution as the object of the offense, and two more levels for a loss of more than $50,000 but less than $250,000. (PSI at ¶ 26-27). Two levels were deducted for acceptance of responsibility and an additional level for cooperation. (PSI at ¶¶ 34-35). The resulting total offense level was twenty-one. (PSI at ¶ 36). He was assessed one criminal history point for a 2003 conviction for possession of twenty grams or less of cannabis (03-10750). (PSI at ¶ 39). His criminal history category was therefore I. (PSI at ¶ 41). The "other criminal conduct" section notes Beasley was "definitively linked" to four other bank robberies. (PSI at ¶ 49). They are: a September 14, 2006, Washington Mutual robbery in Tamarac with a loss of $150,000; a February 7, 2007, Washington Mutual robbery in Weston with a loss of $41,000; an April 3, 2007,

attempted robbery of a Washington Mutual in Palm Beach; and an April 4, 2006, World Savings Bank robbery in Boca Raton with a loss of $18,579. (PSI at ¶¶ 50-53). The PSI notes Beasley has no pending charges. (PSI at ¶ 54).

Beasley's total offense level of twenty-one and criminal history category of I resulted in a guidelines range of: thirty-seven to forty-six months imprisonment with mandatory consecutive sentencing of eighty-four months for Count (3); supervised release of at least three and not more than five years; a fine between $12,500 and $125,000; and restitution. (PSI at ¶¶ 87, 89, 93, 95).

Beasley objected to the PSI because it mentions bank robberies for which the he was never charged and for which he denied involvement. (Crim-DE# 47); (PSI at ¶¶ 49-54).

At the sentencing hearing, former FBI Agent Terry Mullen testified there were similarities between the instant offense and four uncharged bank robberies. (Crim-DE# 64 at 11-12). The robberies were of Washington Mutual banks, except one that involved a World Savings Bank. (Crim-DE# 64 at 15-16). In all the offenses, the perpetrators were dressed like ninjas in dark long-sleeved shirts and dark long pants, stocking masks, and gloves. They carried two-way radios and police scanners was well as a nylon gym bag for the money and AK-47 handguns and, one time, a shotgun. (Crim-DE# 64 at 18-19). They would put guns to bank employees' heads, point guns at people in the bank, physically push people to the ground and threaten to kill them. (Crim-DE# 64 at 19-20). They would drive a stolen car to the bank and leave a safe-car nearby. After the offense, they would drive away in the stolen car then abandon it and flee in the safe-car. (Crim-DE# 64 at 20). Most of the offenses involved stolen Ford Taurus as getaway cars. (Crim-DE#

64 at 15-16). Beasley and his brother lived in Broward County in the same geographic area where the getaway cars were stolen. (Crim-DE# 64 at 17).

Mullen and another FBI agent, Scott Wilson, went to talk to Beasley the hospital in Delray after he was apprehended in the instant robbery of a Washington Mutual in Fort Worth. (Crim-DE# 64 at 23). The agents arrived at the hospital around 1:30 PM, about three hours after Beasley sustained a gunshot graze to his neck while fleeing from the robbery. (Crim-DE# 64 at 23, 51). Beasley was in a trauma unit, handcuffed to the bed, alert and awake and eating Jell-O when the agents arrived. (Crim-DE# 64 at 23, 25-26). He immediately asked about his brother, and Mullen told him his brother had been shot and died while he fled from the robbery. Beasley became upset so the agents left the room for twenty to thirty minutes. (Crim-DE# 64 at 26-27). During this period, Wilson[1] went to the nurse's station and found out Beasley was not on any medication. (Crim-DE# 64 at 26). The agents re-entered the room and explained Beasley's rights. Beasley understood what Mullen was saying and responded to his questions. (Crim-DE# 64 at 27). He understood his rights, agreed to talk to the agents and signed waiver form at 2:37 PM. (Crim-DE# 64 at 28-30).

Beasley explained he and his brother had robbed a bank that day using a stolen car as the getaway vehicle. They had left a friend's car nearby as a safe-car for their escape. (Crim-DE# 64 at 31). They pulled in front of the bank and waited for some customers to leave then went into the bank. Beasley was armed with an AR-15 assault rifle and his brother with a Tech-9 rifle. The brother was carrying a bag and went into a vault. They had two-way radios and

---

[1] Wilson was unavailable for the hearing.

a police scanner. (Crim-DE# 64 at 32). They ordered everyone on the floor then the brother went into the vault for money. They got into the stolen vehicle and drove it to the safe-car, then abandoned it and got into the safe-car and left. (Crim-DE# 64 at 32). Police had followed them to the safe-car; they crashed it, both fled, and Beasley was apprehended. (Crim-DE# 64 at 33).

Beasley also described three other bank robberies and one attempted bank robbery that he and his brother had committed. Approximately three weeks earlier, on April 3, 2007, they had attempted to rob a Washington Mutual Bank in West Palm Beach in which they used a stolen white Ford Expedition. (Crim-DE# 64 at 33). They had forgotten their radios and police scanner that day, and did not want to confront the security guard inside the bank so they left. (Crim-DE# 64 at 35). In February, 2007, they robbed a Washington Mutual in Weston. They drove a Volkswagen to the bank and had a safe-car parked nearby. (Crim-DE# 64 at 36). On September, 14, 2006, they robbed a Tamarac Washington Mutual. (Crim-DE# 64 at 39). Two years earlier, Beasley and his brother were joined by a third brother to rob a World Savings Bank. The third brother was murdered shortly after the offense. (Crim-DE# 64 at 41-42). In each of the successful robberies, Beasley's brother went into the vault, they communicated by two-way radios, had a police scanner, drove a stolen car to the bank and had a safe-car parked nearby for their escape. (Crim-DE# 64 at 38-40).

The interview concluded at 4:30 or 4:35 PM. (Crim-DE# 64 at 44). Beasley never asked to stop, did not appear to be in pain, and his speech was clear and he made eye contact. (Crim-DE# 64 at 44-45). However, the officers had left the room for a break at approximately 3:45 PM when a nurse entered. (Crim-DE# 64 at 51). They stopped the interview at 4:30 PM because a nurse wanted to

6

administer pain medication. (Crim-DE# 64 at 51).

FBI Agent John McVeigh testified he had investigated a string of eleven South Florida bank robberies and one attempted robbery in Broward and Palm Beach Counties that appeared to involve the same individuals. (Crim-DE# 64 at 60, 78). The Court limited information from the eleven related robberies down to just those which Beasley had admitted to FBI agents. (Crim-DE# 64 at 97-98). McVeigh testified regarding similarities between the instant robbery and the other offenses he investigated. These included the use of a black and blue gym bag, assault rifles, violence and threats against the victims, and the modus operandi that Mullen had described. (Crim-DE# 64 at 65-66, 73, 79-80). The only major difference was that three individuals were involved in the April 4, 2006, robbery, and only two were involved in the others. (Crim-DE# 64 at 77).

The Government introduced surveillance photographs from the instant offense as well as the offenses on September 14, 2006, April 3, 2007, and April 4, 2006. (Crim-DE# 64 at 46, 71). Two individuals in dark colored clothes and automatic weapons holding the same blue and black gym bag appear on all the tapes. (Crim-DE# 64 at 71). The Government also introduced evidence that a stocking cap was found inside the Volkswagen getaway car used in the February 2, 2007, robbery that followed the same modus operandi as the other offenses. (Crim-DE# 64 at 21). DNA testing of the cap matched Beasley's brother who was involved in the instant offense. (Crim-DE# 64 at 75).

Beasley's mother's home, where Beasley was living, was located in same general area from where the getaway cars had been stolen. A search of the home revealed bullet proof vests, rounds compatible

with weapons at the scene, assault-type weapons like those used in the offenses, and photographs with Beasley and his brother with large amounts of money. (Crim-DE# 64 at 81, 83-84). A search of Beasley's brother's home revealed printed maps from internet showing locations of Washington Mutual banks throughout South Florida and locations of rental car companies and car dealerships in the area, ammunition consistent with a Tech-9, and a police radio scanner. (Crim-DE# 64 at 88-91). The same type of two-way radio was found at each brother's home. (Crim-DE# 64 at 91-92). The crashed Hyundai that the brothers had used as safe-car in the instant offense was owned by a friend of Beasley family. (Crim-DE# 64 at 92).

The Court found Mullen's and McVeigh's testimony credible. (Crim-DE# 64 at 109-10). The Court found there were similarities and unique characteristics among the robberies, and found by a preponderance of the evidence that Beasley participated in the attempted robbery on April 3, 2007, and the robberies in February, 2007, September, 2006, and April 2, 2006, with one or more of his brothers. (Crim-DE# 64 at 109-10). The Court sustained Beasley's objection to the reference to all eleven bank robberies. (Crim-DE# 64 at 109); (PSI at ¶ 49).

The parties agreed the guidelines were correct. (Crim-DE# 64 at 112). Defense counsel requested a sentence at the top of the guidelines of 130 months, and the Government requested an upward variance of 180 months. (Crim-DE# 64 at 114, 123).

The Court discussed the statutory factors in light of the facts of the case and decided a 180-month sentence was appropriate. (Crim-DE# 64 at 117). The Court adjudicated Beasley guilty and sentenced him to sixty months (Count (1)), ninety-six months (Count

(2)), concurrent, and eighty-four months (Count (3)), consecutive, for a total of 180 months imprisonment, plus sixty months of supervised release and restitution of $2,795. (Crim-DE# 58).

On direct appeal, Beasley argued:[2] (1) the Court improperly considered the three uncharged bank robberies as "relevant conduct" under Section 1B1.3 of the sentencing guidelines; (2) the uncharged robberies were not appropriate bases for the imposition of a variance from the Guidelines under Title 18, Section 3553(a); and (3) the "mini trial" the Court held at sentencing on each prior uncharged offense violated his Constitutional rights because he was not afforded a jury trial, and the court rather than a jury decided how much weight to afford his confession to the uncharged robberies.

The Eleventh Circuit affirmed Beasley's sentence for the following reasons:

> First, the record shows that, contrary to appellant's argument, the district court did not consider the uncharged robberies under § 1B1.3 to determine the Guidelines sentence range; rather, the court considered the robberies under § 3553(a) in deciding to impose an upward variance. Second, § 1B1.3 did not limit the court's discretion to consider the robberies under §§ 3661 and 3553(a). Finally, nothing in the Constitution or Supreme Court precedent precluded the court from conducting the sentencing hearing as it did and finding that appellant committed the uncharged robberies.

(Crim-DE# 69 at 7).

---

[2] The appellate issues are gleaned from the Eleventh Circuit's opinion, (Crim-DE# 69 at 4-5), and the Government's appellate brief, (Civ-DE# 11-2).

Beasley filed the instant motion to vacate on January 22, 2010.

## IV. Statute of Limitations

The Government concedes the instant motion is timely.

## V. Standard of Review

Section 2255 authorizes a prisoner to move a sentencing court to vacate, set aside, or correct a sentence where "the sentence was imposed in violation of the Constitution or laws of the United States, or . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. §2255(a); see Hill v. United States, 368 U.S. 424, 426-27 (1962). A sentence is otherwise subject to collateral attack if there is an error constituting a "fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979); Hill, 368 U.S. at 428.

A defendant who pleads guilty "waives all non-jurisdictional challenges to the constitutionality of the conviction" and may only attack the knowing and voluntary nature of the plea. See Wilson v. United States, 962 F.2d 996 (11th Cir. 1992). To enter into a voluntary plea, the defendant must understand the law in relation to the facts. McCarthy v. United States, 394 U.S. 459 (1969). The court taking the plea must address the defendant personally in open court before accepting the plea "and determine the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement)." Fed. R. Crim. P. 11(b)(1). The court must specifically address three "core principals" ensuring that a defendant "(1) enters his guilty plea

free from coercion, (2) understands the nature of the charges, and (3) understands the consequences of his plea." United States v. Moriarty, 429 F.3d 1012 (11th Cir. 2005). To ensure compliance with the third core concern, Rule 11(b)(1) provides a list of rights and other relevant matters about which the court is required to inform the defendant prior to accepting the plea, including the right to plead not guilty and be represented by counsel. See id.; Fed. R. Crim. P. 11(b)(1). The defendant's declarations in open court during the plea colloquy carry "a strong presumption of verity" and cannot be overcome by conclusory or unsupported allegations. Blackledge v. Allison, 431 U.S. 63, 74 (1977); United States v. Medlock, 12 F.3d 185, 187 (11th Cir. 1994).

To prevail on a claim of ineffective assistance of counsel, the movant must establish: (1) deficient performance - that his counsel's representation fell below an objective standard of reasonableness; and (2) prejudice - but for the deficiency in representation, there is a reasonable probability that the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668 (1984); Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000). In the context of sentencing, a defendant is required to prove that, if counsel had not performed deficiently, the result of his sentencing proceeding would have been different. Glover v. United States, 531 U.S. 198, 203-204 (2001); Forrester v. United States, 349 Fed. Appx. 528 (11th Cir. 2009).

There is a narrow exception to the requirement that a defendant must demonstrate prejudice when counsel is ineffective per se. That is, a showing of prejudice is unnecessary if there are circumstances "that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is

unjustified." United States v. Cronic, 466 U.S. 648, 658 (1984). The exception applies and prejudice is presumed if: "(1) counsel is completely denied; (2) counsel is denied at a critical stage of trial; or (3) counsel 'entirely' fails to subject the prosecution's case to meaningful adversarial testing." Johnson v. Alabama, 256 F.3d 1156, 1187 n. 17 (11th Cir. 2001); see Cronic, 466 U.S. at 658. "The burden of proof under Cronic is a very heavy one." Frazier v. Sec'y, Dep't of Corr., 197 Fed. Appx. 868, 872 (11th Cir. 2006). Cronic's presumption of prejudice "applies to only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." Frazier, 197 Fed. Appx. at 872 (quoting Chadwick v. Green, 740 F.2d 897, 900 (11th Cir. 1984)).

Bare and conclusory allegations of ineffective assistance which contradict the record and are unsupported by affidavits or other evidence do not require a hearing. Chandler v. McDonough, 471 F.3d 1360 (11th Cir. 2006) (no hearing warranted in the absence of any specific factual proffer or evidentiary support); Peoples v. Campbell, 377 F.3d 1208 (11th Cir. 2004) (hearing is not required for frivolous claims, conclusory allegations unsupported by specifics, or contentions wholly unsupported by the record).

## VI. Discussion
### (1) Ineffective Assistance of Counsel

Beasley contends counsel was ineffective *per se* for failing to investigate whether he had taken medication before and during his confession and for failing to suppress the confession as involuntary because he was (a) under the influence of medication and (b) emotionally traumatized by the news of his brother's death. He claims he was prejudiced because the Court imposed an enhanced

12

sentenced based on his confession that he was involved in four uncharged offenses.

Beasley's claims that counsel failed to conduct adequate pre-trial investigation and file a pre-trial motion to suppress his confession were waived by his entry of a voluntary guilty plea.[3] The record indicates the Court complied with Rule 11 and ensured Beasley's plea was knowing and voluntary. He stated at the plea hearing that his plea was free from coercion, that he understood the nature of the charges, and understood the consequences of his plea including a possible sentence of life plus thirty years. See Fed. R. Crim. P. 11(b)(1); (Crim-DE# 62). Beasley's claims of ineffective assistance of counsel were waived by his knowing and voluntary guilty plea. By entering a guilty plea, Beasley told his lawyer not to conduct any further investigation or present any pre-trial or trial proceeding any legal defenses that he may be entitled to as it relates to his case. He is therefore barred from pursuing this claim here. McCarthy, 294 U.S. at 459; Wilson, 962 F.2d at 996.

To the extent Beasley suggests counsel was ineffective for failing to attack evidence regarding his confession at the

---

[3] Beasley appears to suggest his guilty plea was involuntary because he has "no memory whatsoever of his giving an interview with Agent Mullens," and that adequate investigation by counsel would have revealed the confession's existence. (Civ-DE# 1 at 19). This claim is conclusively refuted by the record. During the Government's factual proffer at the plea hearing, the prosecutor referred to the "post-arrest statement" in which Beasley had admitted he and his brother committed the instant offense. (Crim-DE# 62 at 38). Beasley agreed the factual proffer was true and entered his guilty plea. (Crim-DE# 62 at 39). Further, Beasley states in his Reply that he recalled speaking to the agents and discussing his brother's death but not discussing the details of the offenses with them. Beasley's claim that he did not recall providing a post-arrest statement conflicts with his admissions during the plea hearing as well as the position he takes in his Reply and should be rejected. See Blackledge, 431 U.S. at 73-74 (solemn declarations carry a strong presumption of truthfulness).

13

sentencing hearing, this claim lacks merit. The Court heard evidence that Beasley was emotionally upset and hospitalized for a gunshot wound at the time of his confession. Counsel cannot be deemed deficient for failing to introduce cumulative evidence on these matters. See <u>Van Poyck v. Fla. Dep' t of Corr.</u>, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002) ("A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative."). Nor can counsel be deemed deficient for failing to introduce medical records that were not exculpatory for the reasons set forth in Claim (2), infra. Moreover, Beasley is unable to demonstrate prejudice in light of the bountiful evidence independent of his confession that inculpated him in the four prior offenses. Even if counsel had objected or introduced evidence attacking the confession's voluntariness or reliability, a preponderance of the evidence still supported the Court's finding that Beasley was involved in the four uncharged offenses. <u>See</u> Claim (2), infra. There is no reasonable likelihood that any of the information Beasley presently identifies would have probably changed the outcome of his sentencing hearing.

No evidentiary hearing is required because Beasley's claims that counsel was ineffective under <u>Strickland</u> and <u>Cronic</u> are wholly unsupported by the record.

(2)   <u>Due Process</u>

Beasley appears to assert his sentencing violated due process because the Court relied on four additional offenses to which he did not plead guilty and for which he was not tried.

A court may consider relevant facts concerning a defendant's background, character, and conduct when imposing a reasonable

14

sentence. United States v. Amedeo, 487 F.3d 823, 833 (11th Cir. 2007). This includes consideration of a defendant's uncharged criminal acts so long as those acts are proved by a preponderance of the evidence. See Nichols v. United States, 511 U.S. 738 (1994) (noting uncharged conduct can be considered for sentencing purposes so long as it is proved by a preponderance of the evidence); United States v. Lindsey, 482 F.3d 1285, 1294-95 (11th Cir. 2007). Eleventh Circuit precedent "squarely holds that sentencing judges may find facts under an advisory Guidelines system so long as the sentence imposed does not exceed the statutory maximum." United States v. Ghertler, 605 F.3d 1256, 1269 (11th Cir. 2010). "A sentencing court may consider any information, (including hearsay), regardless of its admissibility at trial, in determining whether factors exist that would enhance a defendant's sentence, provided that the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence." United States v. Baker, 432 F.3d 1189, 1253 (11th Cir. 2005). However, a defendant has the due process right not to be sentenced based on false or unreliable information. Ghertler, 605 F.3d at 1269. To prevail on such a due process challenge, a defendant must show (1) the challenged evidence is materially false or unreliable, and (2) it actually served as the basis for the sentence. United States v. Bourne, 130 F.3d 1444, 1447 (11th Cir. 1997).

The record refutes Beasley's due process claim because he was not sentenced based on materially false or unreliable information. Agent Mullen testified he interviewed Beasley in the hospital approximately three hours after Beasley sustained a grazing gunshot wound to his neck. He was alert, responsive, and did not appear to be in a great deal of pain. When Beasley asked about his brother's condition, Mullen disclosed he had died during his flight from

officers. He left Beasley alone for twenty or thirty minutes before continuing the discussion. When the conversation resumed, Beasley indicated he understood his rights, agreed to talk with the agents, signed a rights waiver form, and provided a detailed statement in which he admitted he and his brother had committed the four uncharged offenses. Further, Agents Mullen and McVeigh testified the same modus operandi was used in the four uncharged cases and the instant case. The Government introduced surveillance images from the instant offense as well as three of the uncharged offenses. DNA from a cap found in the getaway car for the February 2, 2007, robbery matched Beasley's brother who was also involved in the instant bank robbery. Further, searches of Beasley's and his brother's home revealed the type of weapons, two-way radios and a police scanner used in the uncharged offenses as well as photographs of Beasley and his brother with large amounts of money. The Court specifically found the agents' testimony to be credible.

This evidence was sufficient for the Court to conclude by a preponderance of the evidence that Beasley and his brother engaged in the four uncharged offenses. See Ghertler, 605 F.3d at 1270 (evidence sufficient to support district court's finding that defendant committed a fraud that was nearly identical to the other offenses and supported by evidence including hearsay testimony that was corroborated by photographs from surveillance cameras and other evidence); United States v. Kalaycioglu, 210 Fed. Appx. 825 (11th Cir. 2006) (FBI agent's hearsay testimony served as an adequately reliable basis for restitution order where defendant failed to establish it was materially false or otherwise lacking minimal indicia of reliability; he did not rebut the hearsay testimony and other evidence supported the testimony).

Beasley's present attempt to refute Mullen's testimony with

16

medical records is unavailing. The records[4] indicate Beasley received pain medication forty-five minutes after the interview began. See (Civ-DE# 1 at 27). These records are consistent with Mullen's testimony that Beasley was not under the influence of any medication at the time he waived his rights, and that officers briefly left the room for a nurse during the interview. Assuming Beasley received medication at that time, there is no indication it rendered the confession materially false or unreliable. The confession was detailed, coherent and consistent with other evidence. Moreover, evidence regarding pain medication does nothing to negate other independent evidence implicating Beasley in the four uncharged offenses including modus operandi, DNA evidence, surveillance videos, and evidence found during searches of Beasley's and his brother's homes. Beasley has failed to carry his burden of establishing the evidence upon which he was sentenced was materially false or unreliable. See United States v. Bunkley, 2010 WL 3860575 (11th Cir. Oct. 5, 2010) (defendant failed to show officer's testimony was materially false or unreliable where the district court expressly found it to be credible and the testimony was supported by other evidence). No due process violation occurred and habeas relief is unwarranted.

Based on the foregoing, it is recommended that the motion to vacate be denied without an evidentiary hearing.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

---

[4] Beasley contends the records indicate he was medicated upon arrival at the hospital, however, the records he cites are for an individual named Jean Ferber, born on January 1, 1960, and do not appear to relate to Beasley's treatment in any way. (Civ-DE# 1 at 24). Beasley was born on June 21, 1983. (PSI, page 3).

SIGNED this 19th day of October, 2010.

                                                     UNITED STATES MAGISTRATE JUDGE

cc:   Brandon Beasley, pro se
      Reg. No. 72775-004
      FCI-Estill
      Federal Correctional Institution
      Inmate Mail/Parcels
      PO Box 699
      Estill, SC 29918

      Janice Le Clainche
      United States Attorney's Office
      500 Australian Ave., Suite 400
      West Palm Beach, FL 33401

      Anne Ruth Schultz
      United States Attorney's Office
      99 NE 4 St.
      Miami, FL 33132